WALKER, Respondent, *v.* HILL, Appellant.

(No. 6,758.)

(Submitted May 12, 1931. Decided June 2, 1931.)

[300 Pac. 260.]

*Mr. J. A. Poore,* for Appellant, submitted a brief and argued the cause orally.

*Mr. Timothy Nolan, Mr. E. Pat Kelly* and *Mr. Harlow Pease,* for Respondent, submitted a brief; *Mr. Pease* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an appeal by defendant from a judgment in favor of plaintiff entered upon the verdict of a jury. Defendant moved for a new trial, which was denied.

It appears from the testimony that the plaintiff has been a member of the bar of this court, with his office at the city of Butte, for over twenty-five years and during that period has had an extensive experience in the general practice of the law. He was acquainted with Walter J. Hill, the defendant, and his wife, Mildred Baker Hill, prior to the occurrences which culminated in this lawsuit. Mr. Hill was a wealthy man, worth upwards of a million dollars. On October 12 or 13, 1927, Mrs. Hill called upon plaintiff with respect to troubles she had been, and was, having with her husband, and retained plaintiff to bring a suit for separate maintenance or a divorce. From the statements made by her, plaintiff would have been justified in commencing an action for either. Mrs. Hill was then practically penniless; indeed, plaintiff advanced her $200 to defray her immediate necessities.

After repeated conferences with Mrs. Hill, and after having advised himself sufficiently upon the law applicable to the facts, plaintiff advised Mrs. Hill to begin suit for separate maintenance rather than divorce, to which she assented. Before commencing the action, plaintiff, at the instance of Mrs. Hill, got in contact with defendant at Livingston by telephone, telling him what Mrs. Hill contemplated, and asked him to come to Butte for a conference looking to a reconciliation between the parties. Defendant professed to be too busy to attend the conference.

Plaintiff then began an action in which Mrs. Hill was named as plaintiff and Mr. Hill defendant, wherein Mrs. Hill prayed for a decree of separation from bed and board and for sep-

arate maintenance in the sum of $5,000 per month, payable monthly, for the sum of $2,500 suit money, and for the sum of $25,000 attorney's fees.

The complaint was filed October 15, 1927, and summons issued thereupon. On the same day an order to show cause was issued against the defendant requiring him to appear in the district court on the twenty-second day of October, 1927, and so forth. Immediately thereafter Mrs. Hill left for Livingston with the papers for service upon her husband. He, in the meantime, had left Livingston for Butte. She traveled by train; he by automobile. Immediately after his arrival at Butte the defendant asked plaintiff to call upon him at the Thornton Hotel, which plaintiff did. Plaintiff testified: "I met him at the hotel; he had sent for me and I went to his room and he importuned me for some time to use my endeavors with his wife, Mildred Baker Hill, to bring about a reconciliation. I told him that was my attitude in the matter, and that was Mrs. Hill's attitude, * * * and I said, 'your wife is willing to meet you half way. She wants you to be decent, to go on the "wagon" and treat her like a human being, quit this barbarous treatment of her. And now she wants you to put her in a position that when you go on these drunks, beat and abuse her, you cannot throw her out in the cold' "—to which defendant answered: "I am crazy about Mildred * * * . I want you to see Mildred as soon as you can and tell her I will make any promise she wants or demands; I will give her anything that is fair or reasonable and if you can bring about a reconciliation and peace between us both I will pay your bill for any services you render me and I will pay your bill for any services you render Mildred as soon as this matter is dismissed."

At plaintiff's instance Mrs. Hill returned to Butte, and a series of conferences resulted. Some were between plaintiff and Mrs. Hill; some between plaintiff and defendant; some between plaintiff, defendant, and others; some between plaintiff and defendant's attorney. The testimony is that not only did defendant frequently beseech plaintiff to bring about a recon-

ciliation, but he importuned influential friends to intervene in his behalf in order that reconciliation between himself and wife could be effected, and frequently promised to pay plaintiff "his fees" upon the attainment of that desirable result. Mrs. Hill, through plaintiff, demanded that defendant place $250,000 in her name as a trust fund. Plaintiff said defendant "opposed the money settlement; he did not want to pay so much, but he wanted his wife and wanted her affection and wanted to be reconciled." Finally Mr. and Mrs. Hill were brought into personal conferences, and, as a result of all the conferences which have been mentioned, the two went to Livingston together, but without then having reached a definite settlement.

In the meantime plaintiff had associated E. Pat Kelly, a lawyer residing in Livingston, as counsel for Mrs. Hill, but after she returned to Livingston she continued to consult plaintiff respecting the pending litigation. On October 24, 1927, Mrs. Hill signed a praecipe for dismissal of the suit, to which plaintiff gave his assent. However, this document was not filed until October 26, 1927, and the suit was not dismissed until November 21, 1928. At this time, October 24, 1927, the reconciliation between the parties seemed complete, and defendant had promised to place $250,000 in trust for his wife. In fact, he had summoned Mr. Ryan, his St. Paul attorney in whom Mrs. Hill also had great confidence, to prepare a contract to that effect, in accordance with Mrs. Hill's understanding. When the contract was finally put in writing, it provided that Mrs. Hill should receive $833 per month for herself and also the sum of $200 per month for the support of her parents, who were dependent upon her. This contract was not signed until Mr. and Mrs. Hill had returned from what she called a honeymoon trip to California, which was about a month after the praecipe for dismissal was filed. Contemporaneously with signing the praecipe, Mrs. Hill telephoned plaintiff, so he testified, telling him she was sending him a check for the money he had advanced for her needs, and that she and defendant had made up their differences, "and were going on a honeymoon." "Walter told me—he is

right here now listening—for you to send him a bill and he will pay you," and, said plaintiff, Walter hollered over the phone, "You bet you, that's right, Tom."

Mr. Kelly testified that on the evening of October 24, 1927, at Mrs. Hill's apartments at the Murray Hotel in Livingston, defendant expressed his appreciation for what Mr. Kelly had done for Mrs. Hill, saying that he had made a settlement with her, that he was going to put in trust for her use a quarter of a million dollars, and "she can have the income from it as long as she is Mrs. Hill." Mr. Kelly said, "Walter put his hand on my shoulder and he said to me, 'Don't you worry about the fees; I will take care of you and Tom.'"

There is other testimony in the record substantiating plaintiff's claim that defendant promised to pay him for the services which he had rendered Mrs. Hill prior to the dismissal of the action. Plaintiff's services covered a period commencing on the 12th or 13th of October, and extending to October 25, 1927.

The brief of defendant's counsel is a formidable document, and it was well supported by oral argument. The main question in the case is whether the contract sued upon, which was not in writing, is grounded upon an original undertaking of defendant or upon a contract of guaranty. We think the contract sued upon is an original undertaking of defendant. The conclusion is inescapable that, when defendant realized his situation, he found it to his great advantage to effect a reconciliation with his wife and to do away with the legal proceeding which she had commenced. There was every reason why he should do this. In the first place, he was passionately fond of his wife and desired to avoid a severance of their marital relations. In the second, he knew that, upon the hearing of the order to show cause, the court, in all probability, would grant his wife temporary alimony in accordance with her station in life—and she was the wife of a millionaire—suit money, and counsel fees, and he must have been mindful that the court in making the order would take into consideration his great wealth. In order to win back the favor of his wife and avoid paying what the court probably would order

him to pay, he adopted the sensible course of attempting to settle the matrimonial troubles which confronted him. That he would have had to pay if the suit went on there is no doubt. (*State ex rel. Wooten* v. *District Court,* 57 Mont. 517, 9 A. L. R. 1212, 189 Pac. 233, 236; *State ex rel. La Point* v. *District Court,* 69 Mont. 29, 220 Pac. 88.) He made himself liable for the payment of his wife's attorney's fee which he had reasonable ground to believe the court would compel him to pay. His promise was not to guarantee the debt of another. It was an original promise on his part to free him from a liability directly impending.

It is true that in the first instance Mrs. Hill was liable for plaintiff's fees, and that originally she and her husband were made parties to this suit, although later she was dismissed as a party defendant. This does not alter the situation; does not relieve defendant. When the action was begun, Mrs. Hill was practically penniless. Plaintiff undertook the case upon the presumption that his compensation in the ordinary process of law would come from the husband. The statute, section 5769, Revised Codes 1921, and the cases above cited, justified that position. The plaintiff by statute was given a lien upon the wife's cause of action, which could not "be affected by any settlement between the parties before or after judgment." (Sec. 8993, Rev. Codes 1921.) To what extent the statute may operate in suits for separate maintenance we are not now called upon to determine, but it clearly operates with respect to attorney's fees which the court may allow, and may go further if it does not run counter to the rule against champerty.

Defendant's counsel calls to our attention section 8175, which relates to an engagement to answer for the obligation of another: "A promise to answer for the obligation of another, in any of the following cases, is deemed an original obligation of the promisor, and need not be in writing: 1. Where the promise is made by one * * * who has received a discharge from an obligation, in whole or in part, in consideration of such promise. 2. Where the creditor parts with value

\* ◦ ◌ in consideration of the obligation in respect to which the promise is made.''

As to subdivision 1 it may be argued that as the court had not made an order requiring plaintiff to pay, he was not under any obligation. But this is too narrow a view of the statute. Under an order to show cause served upon him, the defendant was under an obligation to appear in court and resist the application for temporary alimony, suit money, and attorney's fees, such as the court had the power to require of him. As has been observed, the court upon the hearing probably would have made an order that the defendant pay. But the reconciliation and dismissal of the action discharged the defendant from the obligation to appear, and pay if so ordered.

As to subdivision 2, it is argued by defendant's counsel that plaintiff did not part with anything of value because he had already rendered to his client the services for which he claims compensation, but, as suggested by counsel for plaintiff, while plaintiff had not been paid for his services, he still had under his control an effective remedy which would enable him to enforce payment, i. e., the order to show cause issued by the court, which he had the power to bring on for hearing; and it was likewise within his province to advise his client to withhold negotiations until the order to show cause had been heard and determined. Moreover, in permitting the action to be dismissed, he released his lien. If he had not taken an active part in effecting a reconciliation between the parties, he could easily have brought on for hearing the order to show cause, and there can be no doubt that he refrained from doing so upon defendant's promise. So far as the plaintiff is concerned, it is idle to say that he did not relinquish a valuable right.

Plaintiff's counsel suggest: ''It may be said that there was no liquidated obligation, which is true, but no authority holds that the obligation must be liquidated under this rule. Would it be argued that a defendant in a personal injury action who settled his case by an oral promise had not been 'discharged from the obligation' by the dismissal of the action against him?''

It is urged by counsel for defendant that the contract sued on is contrary to public policy, for the reason that it is contrary to public policy for an attorney to be permitted to attempt to serve conflicting interests in litigation. (2 C. J. 619; 2 R. C. L. 973, 974.) He must not put himself in a position where "he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent." (*Strong* v. *International Building, Loan & Inv. Union,* 183 Ill. 97, 47 L. R. A. 792, 55 N. E. 675, 676.) With these statements of the law we are in full accord, but we do not find them controlling here. The fact is that whatever the plaintiff did was done at the instance and with the full approbation of his client. Notwithstanding some of defendant's extravagant statements as to sums he would pay plaintiff for effecting a reconciliation, including the fees payable by his wife, there is no whit of evidence indicating that plaintiff departed from his duty to his client, the wife, in the slightest degree. From the start the wife was desirous of a reconciliation, provided that there be settled upon her in trust the sum of $250,000; and that was the last proposition plaintiff made to defendant.

On the twenty-fourth day of October, 1927, while plaintiff was still Mrs. Hill's attorney, defendant promised to set aside for his wife the sum of $250,000. The contract drawn by Mr. Ryan represented interest at nearly five per cent. per annum on that sum of money. Defendant was himself represented by able counsel, with whom plaintiff conferred. The record is not susceptible of a construction other than that plaintiff's sole endeavor was for his client, the wife, who was seeking to become reconciled to her husband, but only upon the condition that he would make her financially independent and no longer subject to be cast out penniless from the family domicile. (See *Kiepert* v. *Nugent,* 153 Wis. 127, 140 N. W. 1123, 1125.)

But public policy has another function here. It favors the marriage relation and encourages reconciliation between the spouses. An honorable lawyer, employed by either, will

124

attempt to bring a reconciliation about, although he cannot be expected to forego his fees if he does so. Oftentimes he will most deserve his fee if that desired result is accomplished. He bears in mind that the state is specially interested in preserving the marriage relation unbroken; for upon its permanence depends the family, the foundation of the home, "upon the preservation of which, in turn, depends good citizenship and the permanency of a republican form of government." (*Franklin* v. *Franklin,* 40 Mont. 348, 20 Ann. Cas. 339, 354, 26 L. R. A. (n. s.) 490, 106 Pac. 353; *Gates* v. *Powell,* 77 Mont. 554, 252 Pac. 377; and see *Jones* v. *Jones,* 59 Or. 308, 117 Pac. 414.) "The reconciliation of all estranged married persons is very much to be desired." (*Kiepert* v. *Nugent,* supra.)

There was ample evidence to warrant the jury's award of ▉ $5,000. But it is said the court erred in permitting the lawyers called to testify as to value of the services plaintiff rendered to his client to take into consideration, as one of the elements to be considered, the wealth of the defendant. This objection is not well founded. As we have seen, it is the rule in this jurisdiction that the wife in a suit for separate maintenance, on a proper showing, will be granted temporary alimony, suit money, and counsel fees in an amount to be determined by the court, the circumstances of the parties considered. (*Bordeaux* v. *Bordeaux,* 30 Mont. 36, 75 Pac. 524; *State ex rel. La Point* v. *District Court,* supra.)

We find the following in Ruling Case Law: "In determining the amount of an allowance for suit money and counsel fees, the financial circumstances of the parties should be taken into consideration, and such sum awarded as will insure to the wife an efficient presentation of her side of the controversy." (1 R. C. L., p. 913.) The general rule is that, in fixing attorneys' fees, the financial ability of the client may be considered (1) as an incident in ascertaining the importance and gravity of the interest involved; and (2) to determine whether or not the client is able to pay a fair and just compensation for the services rendered, but not to enhance the amount above a rea-

sonable compensation. (6 C. J. 752.) Frequently, the wealth of the client may not at all affect the subject matter of the litigation. Wealthy clients may have litigation of small as well as great importance, where little or much may be involved. But in a proceeding for separate maintenance or divorce, where alimony is demanded, and suit money and counsel fees are asked for, the wealth of the defendant is directly involved, for upon it depends the amount of alimony which may be awarded, as well as the amounts which the court, the circumstances considered, in its discretion may allow for suit money and attorneys' fees. "If the mental attitude and financial ability of the husband are such that he will be able to make a very determined and expensive contest, in order that the wife may have a fair opportunity to present her side of the controversy it is necessary  *  *  *  that she be enabled to employ counsel and make proper presentation for trial." (1 R. C. L. 913; 19 C. J. 222–224.)

In the instant case, therefore, the circumstances considered, the wealth of the husband was properly a matter for consideration, both as to the nature and importance of the litigation, and the character of the services rendered.

Following *Clark* v. *Ellsworth*, 104 Iowa, 442, 73 N. W. 1023, ▮ the court gave instruction No. 7, which reads as follows: "You are instructed that, in arriving at your verdict in this case, in fixing the amount of compensation, if any, to which plaintiff may be entitled, you must not consider the financial circumstances, the ability to pay, or the wealth of the defendant Walter J. Hill to enhance the value of the services, but you may consider such circumstances as an incident in ascertaining the importance and gravity of the interests involved in the litigation in which the services were rendered, and fix such amount as, under all the facts and circumstances disclosed by the evidence in this case, would be, in your judgment, a reasonable amount to compensate plaintiff for his services, not exceeding the amount claimed in the complaint." While this instruction is severely criticised by counsel for defendant, we think that,

126

when the law as above stated is considered, it should go without saying that defendant has no cause for complaint.

Error is also assigned by reason of the fact that the court permitted testimony showing the execution by the husband and wife of the contract drawn up by Mr. Ryan which was not signed until after the praecipe for dismissal of the suit had been filed and plaintiff's services had terminated. It seems to us, as it did to the trial court, that this contract was the direct result of the settlement of the pending difficulties between defendant and his wife, which was brought about by the commencement of the action, and plaintiff's labors in connection therewith, which were strenuous for a number of days.

If it be conceded that it was improper to permit Mrs. Hill, who testified in plaintiff's behalf, to say whether she had received from her husband the amount stated in the contract between herself and defendant, we are unable to see that the error was prejudicial. A binding contract, satisfactory to the wife, had been entered into by herself and husband as a result of plaintiff's labors, and whether it had been carried out or not did not affect plaintiff's right to his compensation. The fact is, however, that Mrs. Hill testified that it was carried out by her husband until she sued for temporary alimony in November, 1929.

Upon the whole case we are satisfied that the agreement of the defendant to pay plaintiff for his services in the action which resulted in a reconciliation between the parties and the dismissal of the action was an original promise on part of defendant, not affected by the statute of frauds, and that no prejudicial error appears in the record. The court was right in denying the motion for a new trial.

The judgment is affirmed.

ASSOCIATE JUSTICES FORD, MATTHEWS and ANGSTMAN and HONORABLE HENRY G. RODGERS, District Judge, sitting in place of MR. JUSTICE GALEN, disqualified, concur.